UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| FIRST STATE BANK OF MONTICELLO, | ) | |
| | ) | |
| Plaintiff, | ) | 04-2089 |
| | ) | |
| v. | ) | |
| | ) | |
| THE OHIO CASUALTY INSURANCE COMPANY, | ) ) | |
| | ) | |
| Defendant. | ) | |

ORDER

The plaintiff, First State Bank of Monticello, is a state bank located in Monticello, Illinois. It is the successor by merger of First State Bank of Atwood ("FSB"). The defendant, Ohio Casualty Insurance Company ("Ohio Casualty"), issued a financial institution bond which, among other things, indemnified FSB for loss "resulting directly from" specified risks.

James Stilwell ("Stilwell") was the proprietor of several local businesses, including Atwood Meat Service and Amishland Country Village in Tuscola, Illinois. FSB held a mortgage loan on Stilwell's residence, but neither he nor his business entities maintained depository accounts at FSB. Stilwell maintained one or more depository accounts at Tuscola National Bank ("TNB").

At various times beginning in 1996, Scott Seegmiller ("Seegmiller"), president of FSB, approached Stilwell to discuss establishing a credit relationship at FSB. At some point, Seegmiller came to regard Stilwell as a poor credit risk. FSB and its employees later became aware that Stilwell and his businesses were under extreme financial pressure and felt that Stilwell lacked credibility. Toward the end of 2002 or early 2003, they knew that Stilwell expected to close on the sale of some land near an outlet mall in Tuscola.

From November 2002 to January 2003, Stilwell began to present to FSB personal checks drawn on the Atwood Meat Service account at TNB.[1] The checks were made payable to cash. Stilwell used the checks to obtain FSB bank money orders[2] made payable, for the most part, to

---

[1] Many, if not most, of the transactions were executed by Mary Barrett or Ryan Bowles. Barrett is Stilwell's sister and Bowles is Stilwell's son-in-law. On a daily basis, Barrett and/or Bowles would wait in the bank teller line and request one or more bank money orders.

[2] Bank money orders are like cashier's checks; they are issued and signed by the bank and backed by the bank's resources. It is a "cash equivalent" because once issued, it cannot be

entities owned and/or controlled by Stilwell.  Stilwell told Seegmiller and Alora Murphy ("Alora"), another FSB officer, that he was purchasing the money orders to pay bills and reduce his tax liability on the land sale.  At first, the bank money orders were few and for smaller amounts.  By mid-December, Stilwell was purchasing multiple bank money orders totaling $30,000 to $50,000 per day.  By the end of December, they totaled $60,000 to $70,000 per day.  At that point, Seegmiller told Alora he was concerned about continuing to sell the money orders to Stilwell.  Alora spoke to Stilwell and an officer at TNB.[3]  She reported to Seegmiller that Stilwell was following his accountant's advice, an assertion that TNB seemingly corroborated.  Seegmiller left it to Alora to decide whether to continue to sell the money orders to Stilwell.  The practice continued.  All together, Stilwell purchased 130 bank money orders totaling $1,945,672.16.

From January 24 to January 28, 2003, TNB dishonored and returned to FSB nine checks that Stilwell had used to purchase $307,000 in bank money orders.  FSB later learned that during the entire time Stilwell was purchasing the money orders with TNB checks, his TNB checking account had a high negative balance.

On or about March 21, 2003, FSB filed a proof of loss pursuant to its coverage with Ohio Casualty.  The claim sought reimbursement for the $307,000 loss from Stilwell's fraudulent scheme.  Ohio Casualty denied the claim, and this lawsuit followed.

Now before the court are the parties' cross-motions for summary judgment [#18, #49].  For the following reasons, Ohio Casualty's motion for summary judgment [#18] is denied.  FSB's motion for summary judgment [#49] is granted.

## ANALYSIS

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c)).  Summary judgment is proper when "a party . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The court must consider the evidence in the light most favorable to the party opposing summary judgment. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The burden of establishing that no genuine issue of material fact exists rests with the movant. *Jakubiec v. Cities Serv. Co.*, 844 F.2d 470, 473 (7th Cir. 1988).  Once the movant has done so, the party opposing the motion bears the burden to respond, not simply by resting on the pleadings, but by affirmatively demonstrating that there is a genuine issue of material fact for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322-324.  In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio*

---

canceled or withdrawn.

[3] The officer, Lloyd Murphy, is Alora's brother-in-law.

*Corp.*, 475 U.S. 574, 586 (1986).  "If [the non-movant] does not [meet his burden], summary judgment, if appropriate, shall be entered against [the non-movant]."  *See* Fed. R. Civ. P. 56(e).

The parties' cross-motions for summary judgment[4] raise two issues: whether FSB's loss "result[ed] directly from" a covered risk, and if so, whether the loss falls within a policy exclusion for "loss caused by an employee."  Thus, the court must undertake a two-step analysis;  if the loss does not result directly from a covered risk, it need not determine whether the loss falls within the policy exclusion.

## I.  Loss "resulting directly from" a covered risk

Ohio Casualty argues that, as a matter of law, the loss did not result "directly" from a covered risk; rather, FSB's own conduct, poor business judgment, and its failure to abide by internal policies and reasonable commercial standards were the intervening and direct cause of the loss.  FSB argues that the loss resulted directly from false pretenses committed by Stilwell on the bank's premises, for which the financial institution bond provides coverage.

Insuring Agreement (B) of the financial institution bond indemnifies an insured for

(1)  Loss of Property *resulting directly from* (a) robbery, burglary, misplacement, mysterious unexplainable disappearance and damage thereto or destruction thereof, or (b) theft, *false pretenses*,[5] common-law or statutory larceny committed by a person present in an office or on the premises of the Insured, while the Property is lodged or deposited within offices or premises located anywhere. (Emphasis added.)

Both parties support their arguments by citing to *RBC Mortgage Co. v. National Union Fire Ins. Co.*, 812 N.E.2d 728 (Ill. App. Ct. 2004).  This is not surprising, since the court in *RBC*

---

[4] FSB's complaint contains two counts.  Count I relates to Ohio Casualty's refusal to indemnify FSB for its loss.  Count II seeks an award of attorney fees and other costs due to Ohio Casualty's "unreasonable and vexatious" delay in settling the claim pursuant to 215 Ill. Comp. Stat. 5/155.  FSB provides no evidence to support Count II, and understandably so.  Under the circumstances of this case, it is highly unlikely that FSB could prove vexatious or unreasonable delay.

[5] Ohio Casualty disputes that Stilwell obtained the bank money orders through false pretenses.  However, Lloyd Murphy states that in November and December of 2002, TNB repeatedly contacted Stilwell to advise him that his account was overdrawn. TNB would allow Stilwell to determine which checks to pay and which to return.  Stilwell's TNB accounts show negative starting and ending balances for each of the months of October 2002 through January of 2003, and as many as 91 returned checks or items in a given month.  The clear inference is that Stilwell wrote checks to FSB knowing there was not enough money in the TNB account to cover those checks.

3

noted that "there is no [other] Illinois case addressing [the definition of] 'direct loss' in the context of fidelity insurance[.]" *RBC*, 812 N.E.2d at 733.  The court determined that in this context, "'direct loss' . . . is a much narrower concept than 'proximately caused loss.'" *RBC*, 812 N.E.2d at 737.  FSB does not argue otherwise.

Simply put, the parties disagree as to whether "direct loss" relates more to the cause or the result.  FSB urges a result-focused determination, distinguishing a "direct loss" from an "indirect loss," as did the court in *RBC*.  An insured suffers an indirect loss when it must indemnify a third party for losses caused by the insured; "the insured's loss is 'indirect' and the third party's loss is 'direct.'" *RBC*, 812 N.E.2d at 733 (citations omitted).  A contrary conclusion would "convert a direct loss policy into a third party indemnity policy or liability policy . . . [because] payment, in practical effect, [would run] directly to the third-party claimant." *RBC*, 812 N.E.2d at 733.  Furthermore, "[l]anguage in a fidelity bond" referring to "'losses directly resulting from' signifies . . . the actual depletion of bank funds[.]" *RBC*, 812 N.E.2d at 733.  Under this view, the insured, FSB, suffered a direct loss of $307,000 from Stilwell's actions, a loss for which it seeks recovery from its insurer, Ohio Casualty.

Ohio Casualty argues a causation-focused determination – in other words, the loss did not directly result from Stilwell's conduct, but from the conduct of FSB.  Ohio Casualty cites to a number of cases to support its argument that FSB caused the loss by failing to follow internal procedures and reasonable commercial banking practices.  In many of the cited cases, however, the insurer denied coverage for the insured's liability to a third party, supporting FSB's distinction between direct and indirect losses.  *See Empire Bank v. Fidelity & Deposit Co. of Maryland*, 828 F. Supp. 675, 677 (W.D. Mo. 1993) (involving liability arising from an adversarial proceeding in a depositor's bankruptcy); *California Korea Bank v. Virginia Surety Co.*, 2000 WL 713798 (9th Cir. 2000) (involving settlement of a depositor's lawsuit); *White Rock Nat. Bank of Dallas v. U.S. Fire Ins. Co.*, 562 S.W.2d 268, 269 (Tex. App. 1978) (same); *First Nat. Bank of Sikeston v. Transamerica Ins. Co.*, 514 F.2d 981, 984 (8th Cir. 1975) (involving liability for losses of third party in a check kiting scheme).

In another case cited by Ohio Casualty, the court relied on specific policy provisions not at issue in this case to determine that coverage was excluded.  *See Mitsui Mfrs. Bank v. Federal Ins. Co.*, 795 F.2d 827, 829 (9th Cir. 1986) (finding that policy expressly excluded coverage for losses on uncollected items of deposit).  Ohio Casualty also quotes a passage from *Bidwell & Co. v. National Union Fire Ins. Co.*, 2001 WL 204843, at *9 (D. Or. 2001) for the proposition that a loss is not "directly from" a forgery when the bank's "improper action" is an intervening, superceding cause of the loss.  However, this quotation is completely unpersuasive as it is clearly identified as the defendant's contention rather than the court's conclusion. *Bidwell*, 2001 WL 204843, at *9.  The court ultimately concluded that the words "'resulting directly from' . . . "represent a traditional proximate cause analysis." *Bidwell*, 2001 WL 204843, at *9.  *Bidwell* is inapplicable to this case.

The above-cited authority fails to support the proposition that FSB's loss is not a direct loss.  FSB is the insured, and FSB alone suffered a loss of $307,000 due to the Stilwell

4

transactions. FSB's loss does not arise from liability to a third party; it seeks recovery of its own loss from its bonding company, Ohio Casualty.

The cited authority does, however, support the proposition that failure to adhere to sound business practices *may* defeat a claim under the bonding agreement. A claim may be denied when a bank cashes checks it knows are forged. *Empire Bank*, 828 F. Supp. at 678. Coverage may also be denied when the bank disburses funds contrary to the depositor's instructions. *California Korea Bank*, 2000 WL 713798 (involving funds disbursed to depositor's spouse); *White Rock*, 562 S.W.2d 268 (involving funds disbursed without the required signatures). Similarly, denial of coverage is warranted when the bank has "adequate knowledge of fraudulent and dishonest acts of [a member of its board of directors] many weeks prior to the loss." *First Nat. Bank of Sikeston*, 514 F.2d at 985. And banks must exercise sound business judgment when extending credit because a loan default is generally not an insured risk. *National City Bank v. St. Paul Fire & Marine Ins. Co.*, 447 N.W.2d 171, 177 (Minn. 1989).

Nonetheless, each of these cases is factually inapposite. There was no known forgery, no breach of an agreement between the bank and its customer, and no cover-up of a bank executive's wrongdoing. Alora signed most of Stilwell's money orders, and believed him to be an honest and successful businessman. She understood, and verified with Stilwell's other bank, that Stilwell's accountant had told him to pay as many expenses as possible to reduce the tax liability on the upcoming land sale. In light of her understanding of his motivation, she believed he had a legitimate business reason to purchase the money orders. At one point, she became concerned about the transactions and called TNB to verify that Stilwell had the funds to cover the money orders.

Ohio Casualty makes much of the fact that FSB's operational policy manual requires an employee to verify the availability of funds used to purchase a bank money order. It is undisputed that for several months FSB issued bank money orders to Stilwell without doing so. However, Stilwell, a well-known small town businessman who had engaged in a significant business venture, had a mortgage loan at FSB. He was not unknown to the people at FSB. Alora questioned Stilwell about what he was doing, discussed the situation and verified information with TNB, and learned from Stilwell that a significant land sale had been delayed several times, extending the time period for which Stilwell needed the money orders. Alora also telephoned TNB to verify that Stilwell had adequate funds to cover the bank money orders. That she may have misinterpreted the information she received does not, in itself, mean she engaged in unsound business practices.

In hindsight, it was indeed unwise to have allowed Stilwell to purchase bank money orders.[6] The same could be said for many of the enumerated events covered by the policy. Business people do not have the benefit of hindsight when they make potentially unsound business decisions. If it were possible to exclude from coverage an enumerated risk by applying a "hindsight" standard and hypothesizing all the ways in which the result could have been avoided,

---

[6] Internal reports issued to the FSB board acknowledge this fact.

5

insurance coverage would be little more than an illusion.

## II.  Loss caused by an employee

Ohio Casualty argues that even if the loss is a "direct loss," coverage under the bond is subject to certain exclusions in Section 2.  Exclusion (h) states, in relevant part,

> This bond does not cover . . . (h) *loss caused by an Employee*, except when covered under Insuring Agreement (A)[7] or when covered under Insuring Agreement (B) or (C) and resulting directly from misplacement, mysterious unexplainable disappearance or destruction of or damage to Property.  (Emphasis added.)

In support of its argument, Ohio Casualty cites the Eighth Circuit decision in *Empire Bank v. Fidelity & Deposit Co. of Maryland,* 27 F.3d 333 (8th Cir. 1994).  On appeal, the Eighth Circuit deferred to the district court's fact-finding.  *Empire Bank*, 27 F.3d at 336 ("the district court in effect found that acts of Floyd Tucker were the *proximate cause* of the loss") (emphasis added).

In fact, the district court opinion shows that the bank officer was well aware of, and turned a blind eye to, the impropriety:

> There was not even a pretense that the [customers'] conduct was proper, only that it would be tolerated regardless of propriety.  Tucker, an officer of [the bank] authorized and assisted [the customers] in cashing [corporate] checks. [The bank] presented *no evidence that Tucker relied on any misrepresentation or nondisclosure in cashing the checks.*  Under these facts Empire . . . in fact assisted in the acts it now seeks recovery for.  Empire received notice that the Walkers were improperly utilizing corporate funds each time Tucker authorized what he knew to be improper transactions.

*Empire Bank*, 828 F. Supp. at 679 (emphasis added).

The facts of this case are distinguishable.  Seegmiller spoke to Stilwell as early as the end of December.  Stilwell claimed he was acting on the advice of his accountant, a fact at least seemingly corroborated by a TNB officer.  FSB employees knew that Stilwell's land sale was delayed, and the delays induced FSB to continue the practice of exchanging bank money orders for ordinary checks, believing it would be resolved when the land sale was completed.  Alora attempted to verify the funds in Stilwell's TNB account and thought she had done so, though in hindsight it appears she may have relied on erroneous or incomplete  information.  Unlike the

---

[7] Insuring Agreement (A) covers loss resulting directly from dishonest or fraudulent acts committed by an employee.  Ohio Casualty states that FSB first asserted a claim under Insuring Agreement A due to the dishonest acts of Alora, who had signed many of the bank money orders.  FSB later withdrew that claim and decided to pursue recovery under Insuring Agreement (B).

plaintiff in *Empire Bank*, FSB did not turn a blind eye to Stilwell's impropriety.

This court declines to construe the language of exclusion (h) to mean loss proximately caused by an employee.  "Proximate cause 'need not be the sole cause nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which, in combination with it, causes the injury.'"  *RBC*, 812 N.E.2d at 737 (*quoting James v. Checker Taxi Co.*, 159 N.E.2d 12, 14 (Ill. App. Ct. 1959)).  A broadly construed exclusion would take away much of the coverage provided in Insuring Agreement (B); most of the perils covered by that section require at least some participation by a bank employee.

## CONCLUSION

For the foregoing reasons, Ohio Casualty's motion for summary judgment [#18] is denied.  FSB's motion for summary judgment [#49] is granted.  This case is terminated.  The parties shall bear their own costs.

Entered this 26th day of September, 2005.

**s\Harold A. Baker**
_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE